UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDY NORMAN,

    Plaintiff,

v.

WILLIAM BARR,

    Defendant.

_____ /

Case No. 18-12304

SENIOR U. S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
DAVID R. GRAND

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16]**

Plaintiff, Sandy Norman, is an African American woman with disabilities. After sustaining a traumatic brain injury from a car accident in 2005, she was diagnosed with cognitive disorder, which makes it difficult for her to learn and comprehend information. After years of rehabilitation, Norman returned to the workforce, and in July 2016 she was hired as a criminal clerk for the United States Marshal Service ("Marshal Service") ("USMS") in Detroit. On September 29, 2017, just after a year in this position, Norman was terminated for poor performance. Following her termination, Plaintiff commenced this action against Defendant, her employer, alleging Americans with Disabilities Americans (ADA) violations and racial discrimination, *inter alia*.

Before the Court is Defendant's Motion for Summary Judgment [16] filed on October 25, 2019. Plaintiff filed a Response [18] on November 23, 2019. Defendant filed a Reply [19] on December 6, 2019. The Court held a hearing on the motion on June 23, 2020. After the hearing Plaintiff filed a Supplemental Brief [22] on July 8, 2020. Defendant filed a Response [25] on July 15, 2020. For the reasons stated below, the Court **GRANTS** Defendant's Motion for Summary Judgment [16].

### FACTUAL BACKGROUND

**a) Norman's Disability**

In 2005, Sandy Norman sustained a brain injury from a car accident. (ECF No. 16-5, PageID. 140). After her accident she was diagnosed with cognitive disorder, depressive disorder, and mood disorder. (*Id.*) Her cognitive disorder affects her confidence and her ability to concentrate, learn and comprehend. (*Id.* at 146). She claims that she at times needs something to be explained to her a couple, three, or even five times before she understands it. (*Id.* at 140).

Norman received disability benefits from 2006 until her return to work in 2014 at Veterans Affairs (VA). (*Id.* at 141). In July 2016, Norman was hired as a criminal clerk at the Marshal Service through Schedule A. (*Id.* at 126-27). Schedule A allows federal agencies to use a non-competitive hiring process to increase employment opportunities for people with disabilities. *Disability Employment*, OFFICE OF PERSONNEL MANAGEMENT, https://www.opm.gov/policy-data-oversight/disability-

employment/hiring/ (last visited July 17 2020); *see also* 5 C.F.R. § 213.3102(u) (2013). When an employer decides to hire a Schedule A candidate, Human Resources (HR) generates a list of qualified applicants. Although Schedule A candidates must provide proof of their disability to the hiring agency, candidates do not have to disclose the nature of their disability to prospective employers. *Id.* Accordingly, Norman did not disclose that she had a cognitive disorder to her supervisors, and they were never made aware of it. (ECF No. 16-2, PageID. 96; 16-5, PageID. 138).

### b) Norman's Hiring

Norman's supervisor, Tanya Miller, looked for a candidate via Schedule A in order to find a qualified candidate quicker than the competitive hiring process. Human Resources sent Miller a list of qualified candidates to interview, which included Norman. (ECF No. 16-2, PageID. 95). Norman was interviewed by Miller, Chief Deputy Marshal Mark Jankowski, and Assistant Chief Deputy Marshal Joseph Abdullah. (*Id.*). She was ultimately given the job because she had a master's degree and great performance reviews from her previous position at the VA. (*Id.* at 114).

### c) Norman's Training

A criminal clerk's duties include: coordinating prisoner movement, arranging prisoner production in federal and state courts, coordinating detainers in state and local custody, and maintaining financial data for jail housing, medical care and

hospital guards. (ECF No. 16-27, 16-28). Before Norman, the Marshal Service in Detroit did not have a criminal clerk for almost one year. The job duties had been split between two employees: Patrick Richards, a Detention Enforcement Officer in Detroit, and Mark Altheide, a criminal program specialist in the Flint sub-office. (ECF No. 16-5, PageID. 129).

When Norman first started, Richards trained her for one month to get her up to speed. (ECF No. 16-7, PageID. 149). He was instructed only to train her on how to use the Justice Detention Information System (JDIS) to process writs and pickups and how to communicate with local, state and federal agencies. (*Id.*). For the first two weeks Richards set his own work aside, sat with Norman every day, and showed and explained to her on the computer how to perform her duties. (*Id.*). Norman took notes during this process. (*Id.*). Richards reviewed some of her notes to make sure she understood what they were discussing. (*Id.*).

During the next two weeks, Richards allowed Norman to do her job by herself to gain experience. (*Id.*). After the training, Richards expressed to his supervisor, Kevin Petit, that Norman was not understanding certain terms or how to properly operate the computer. (*Id.*). He even noted that Norman fell asleep during the training and failed to grasp basic concepts. (*Id.* at 150). Norman claims this training was inadequate, because she was only trained on half of her job: scheduling and producing prisoners for court appearances. (ECF No. 16-5, PageID. 129). She also

states that Richards did not train her in accordance with a particular guideline or procedure, and only trained her by "verbally telling her what to do." (*Id*. at 129-30).

Norman was then trained for five or six weeks by Mark Altheide on the other half of her job: prisoner movement using the eDesignate system. As a criminal program specialist, Altheide's position included the work of a criminal clerk as well as handling warrants. (ECF No. 16-3, PageID. 117-18). Altheide trained Norman on different systems, step-by-step, several times. (*Id.* at 118). They sat at the computer together, reviewed writs, inputted information and went through daily operations and real-life scenarios. (*Id.* at 119). Norman once again took extensive notes. (*Id.*). Although Altheide was optimistic at the start of the training, after weeks repetitively reviewing the same information with Norman, he became frustrated with her inability to retain the information they reviewed together. (*Id.*) "It was repetitive over and over and over again, and what I mean by that is I believe I was down training her for five or six weeks, and then through emails . . . I was realizing she just wasn't picking it up. Because there are basic functions on those systems that you should be able to pick up in week one, and it just wasn't there," Altheide noted. (*Id.*). To help her pick up the information, he went through numerous examples with her, showed her how to do a task while she watched, and had her perform the task while he watched. (*Id.*). Despite his efforts, he told Miller at the end of the training that he did not think Norman "was going to make it." (*Id.*).

Norman states that this training was also inadequate because they did not review the "full scope" of her job and only focused on volunteer surrenders and judgement and commitments. (ECF No. 16-5, PageID. 133). Altheide states that he trained Norman on as much as he could but was limited to due to her inability to grasp basic concepts.

In September 2016, after Altheide returned to Flint, the Grand Rapids sub-office criminal clerk, K.C. Johnson, came to Detroit to train Norman for two-and one-half days. (ECF No. 16-9, PageID. 156-58). Based on the questions Norman asked and the notes she took, Johnson thought no one had trained her before and was surprised to find out that this was her third training. (*Id.*). Johnson tried to get through all the training for the job, but hit the same comprehension and retention obstacles as the previous trainers did. (*Id.*). When Johnson left, she did not think Norman had a grasp on what Johnson was trying to teach her. (*Id.*).

In November 2016, Miller also gave Norman additional training by placing a veteran marshal, Will Willow, to sit with her while he was on light duty. (ECF No. 16-2, PageID. 101). For three months, Willow assisted Norman, answered her questions, and was available to her as a resource. (*Id.*). Norman was additionally trained by a deputy U.S. Marshal on how to coordinate prisoner transportation via airlift. (*Id.*). She was also given a PowerPoint presentation on how to use the JDIS. (ECF No. 16-5, PageID. 130-31).

### d) Norman's Performance Issues and Termination

Miller states that although Norman received more training than any other criminal clerk or employee, she still had consistent deficiencies in her work performance. (ECF No. 16-2, PageID. 99-100). Miller and other management officials received constant complaints from U.S. Attorneys, Bureau of Prisons officials, state courts and almost every other agency the Marshal Service interacted with that emails and phone calls were going unanswered. (*Id.* at 109). On several occasions, prisoners failed to voluntarily surrender because Norman failed to send them a notice of their surrender date. (ECF No. 16-10, PageID. 167, 173, 179). When this occurred Norman also failed to remedy the situation by seeking an extension or warrant for the prisoner's arrest. On one occasion, a judge threatened to hold the Chief Deputy Marshal in contempt of court when a prisoner was not produced. (ECF No. 16-2, PageID. 102). On another occasion, the Marshal Service received complaints when a separation order was not honored and a cooperating witness and the co-conspirator he planned to testify against were erroneously placed in the same prison, placing the witness' life in danger. (*Id.*). Altheide and Richards routinely stepped in to take care of tasks Norman neglected to or could not do. (ECF No. 16-5, PageID. 134-35). Norman does not dispute any of these complaints or allegations.

Due to the overwhelming amount of complaints USMS received about Norman, she was twice removed from her position and placed in the finance

department to help with clerical work. Miller stated that the removals were necessary to "stop the bleeding." (*Id.*). The first removal occurred in October 2016 and lasted a couple weeks. (*Id.*). The second occurred in January 2017 and lasted for at least two months. (*Id.*).

During Norman's second removal, Miller, under the impression that Norman was a probationary employee, attempted to terminate Norman. (ECF No. 16-12, PageID. 228; 16-13, PageID. 230). However, Miller then discovered that Norman was a permanent employee and could not be fired at that time. (ECF No. 16-14, PageID. 234). Instead, upon Norman's return to her criminal clerk duties in March 2017, Miller issued a Performance Concerns and Expectations memo which outlined Norman's specific performance deficiencies and Miller's on-going expectations for improvement. (ECF No. 16-17, PageID. 244).

On March 3, 2017, Miller, Jankowski, Abdullah and Supervisory Deputy U.S. Marshal Jody Nidiffer had a meeting with Norman to determine how to best support her. (ECF No. 16-5, PageID. 136). During this meeting, Norman stated that she at times took 30 minutes to read and comprehend an email. (ECF No. 16-2, PageID. 96). In response, attempting to understand if Norman needed to be trained differently from other employees, Miller asked if Norman's disability affected the way she learned or processed information. (*Id.*). Norman was embarrassed by the question and did not answer. (*Id.*; 16-5, PageID. 138). Miller also told Norman that she could

fill out certain forms and send them to HR to disclose her disability and request accommodations. (*Id.*). Norman never completed these forms and instead filed a complaint with the Equal Employment Opportunity Commission alleging disability and racial discrimination. (ECF No. 16-5, PageID. 138; 16-29).

Despite her employer's efforts, Norman continued to be overwhelmed and on March 31, 2017, she sent an email that she now claims was a request for an accommodation due to her disability. (ECF No. 16-19). In this email she asked for a reduced case load (she was responsible for 500 offenders, the most in the district), the transfer of her airlift duties to a different employee, and the transfer of her billing duties to the finance department. (*Id.*). All of these duties had always been done by previous criminal clerks. (ECF No. 16-9, PageID. 158-59). Nowhere in her email did Norman mention her disability.

On May 19, 2017, Miller placed Norman on a Performance Improvement Plan (PIP) for 60 days. (ECF No. 16-21). During the PIP, Miller met with Norman each week and helped her organize and prioritize her duties. (ECF No. 16-2, PageID. 99-100). She would also confront Norman with work that went undone from that week. (ECF No. 16-5, PageID. 142). In her defense, Norman insisted that she had not been adequately trained and asked Miller for formal training in JDIS and the National Criminal Information Center (NCIC) system, which tracks warrants and criminal histories**.** (*Id.* at 142-43; ECF No. 16-2, PageID. 100). In response, Miller sent

Norman for formal JDIS training in June 2017, which only occurs twice a year in Georgia. (ECF No. 16-2, PageID. 97). Although NCIC was not necessary to do the criminal clerk job, Miller also allowed her to participate in that training as well. (*Id.*). Norman, however, wanted to be excused from her duties in order to complete the NCIC training, because it was extensive. (*Id.*; ECF No. 16-5, PageID. 142). Miller refused to allow her to do so while she was on PIP and told her to wait till after PIP was complete. (*Id.*). After an unsuccessful PIP completion, despite months of extensive training, Norman was terminated on September 29, 2017. (ECF No. 16-25).

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Additionally, the Court views all of the facts in the light

most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 255.

## ANALYSIS

### I. Disability Discrimination

The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) framework governs Plaintiff's discrimination claim under the ADA. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 384 (6th Cir. 2017). First, Plaintiff bears the burden of establishing a prima facie case of discrimination. If Plaintiff establishes a prima facie case, the burden shifts to Defendant to set forth a legitimate non-discriminatory reason for firing her. Finally, the burden shifts back to Plaintiff to show that Defendant's proffered reason is a pretext for discrimination.

#### a. Prima facie case

To establish a prima facie case of discrimination under the ADA, Plaintiff must show that "1) [she] is disabled; 2) [she] was otherwise qualified for the position, with or without reasonable accommodation; 3) [she] suffered an adverse action; 4) the employer knew or had reason to know of [her] disability; and 5) [she] was replaced or the job remained open." *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 735 (6th Cir. 2015).

Defendant only challenges the second element. A qualified individual is one who can perform the essential functions of her employment with or without a reasonable accommodation. 42 U.S.C. § 12111 (8). "Consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* Accordingly, the criminal clerks' essential functions included: coordinating prisoner movement, arranging prisoner production in federal and state courts, coordinating detainers in state and local custody, and maintaining financial data for jail housing, medical care and hospital guards. (ECF No. 16-27, 16-28).

By all accounts, including her own, Norman could not perform these essential functions. Norman argues that to the extent that she was unqualified for her position this was only a reflection of the inadequate training she received and that adherence to her accommodation requests would have made her more qualified. The Court disagrees. Norman received training from six different individuals ranging in methods from hands-on trainings, to formal presentations, to access to a resource personnel. None of these trainings changed Norman's poor performance. There is no evidence that more or different training would have improved her performance.

Moreover, Miller indicates that having already given all of the trainings they possessed, there was nothing left to give Norman. (ECF No. 16-2, PageID. 106, 109).

Additionally, Norman's request for a reduced workload, the transfer of some of her main duties, and the hiring of a second criminal clerk to share her case load, was not reasonable. Although a reasonable accommodation may include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position," removing essential functions from a position is "*per se* unreasonable." 42 U.S.C. § 12111 (9)(B); *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) ("A suggested accommodation is not reasonable if it requires eliminating an 'essential' function of the job."); *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000) ("the ADA does not require employers to accommodate individuals by shifting an essential job function onto others."). Plaintiff has failed to show that any reasonable accommodation would have qualified her for the criminal clerk position.

Further, "prima facie [disability discrimination] case is not made out if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016). Therefore, she has not established a prima facie case for discrimination.

### b. Legitimate, Non-discriminatory Reason for Termination and Pretext

Assuming Norman could establish a prima facie case, in light of uncontroverted evidence of her poor performance, Norman cannot establish that her termination was merely pretextual. The Sixth Circuit states that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Deister v. AAA Auto Club of Michigan,* 91 F. Supp. 3d 905, 919 (E.D. Mich. 2015), *quoting Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012). Here, Defendant asserts that Norman's poor performance was a legitimate and non-discriminatory reason for termination. From complaints about inmates not being produced for court, to calls and emails repeatedly going ignored and other criminal clerks stepping in to "stop the bleeding" – there is overwhelming evidence of Norman's poor performance.

However, to prove that this reason was merely pretextual, Norman "must do more than point to the facts that Defendants knew she was disabled and failed to provide all of her requested accommodations." *Whitfield v. Tennessee*, 639 F.3d 253, 262 (6th Cir. 2011). Disagreement with her performance reviews also fails to establish pretext. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (finding that disagreement with an employer's "honest belief"

of poor performance is not sufficient evidence of pretext); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). Norman must instead prove "pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Plaintiff fails to do so. In fact, her response brief is devoid of any discussion of pretext. Therefore, considering there is no genuine issue as to whether Defendant's legitimate, nondiscriminatory reasons for her termination were pretextual, he is entitled to summary judgment on Plaintiff's disability discrimination claim.

## II. Failure to Accommodate

To establish a prima facie failure to accommodate claim under the ADA, Plaintiff must satisfy the direct evidence test. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (finding that "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence"); *see also Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) ("*Kleiber*, our foundational case establishing that ADA failure to accommodate claims are analyzed pursuant to the direct test, controls"). Under the direct evidence test, she must prove "(1) that [s]he is disabled, and (2) that [s]he is ' 'otherwise qualified' for the position despite . . . her disability: [either] (a) without accommodation from the

employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Fisher*, 951 F.3d at 417.

Plaintiff has not established that she was "otherwise qualified" under any of these conditions. First, the record shows that the Marshal Service, without providing Plaintiff with an accommodation, received numerous complaints and experienced performance issues as a result of Plaintiff's work performance.

Second, there is no evidence that Plaintiff would have been qualified, if an essential job requirement was eliminated. To satisfy this burden, she must "put forth evidence that [s]he is qualified to perform the other functions of the job absent the challenged job requirement." *Douglas v. Esper*, No. 2:18-CV-02420, 2020 WL 206936, at *4 (W.D. Tenn. Jan. 14, 2020). For example, in *Douglas*, plaintiff, a pipelineman with a psychological disability, used the testimony of a clinical psychologist and therapist to prove that even if the job requirement of working on the Dredge Hurley were eliminated, he could successfully perform his other tasks. *Id.* Their medical opinions explained that limiting his work to other areas would not trigger his symptoms. *Id.* Similarly, in *Keith v. Cty. of Oakland*, the Sixth Circuit found that a deaf lifeguard was still "otherwise qualified" for the position because he could "perform the *essential* communication duties of a lifeguard" such as rescuing a distressed swimmer and performing CPR. 703 F.3d 918, 927-28 (6th Cir.

2013). In contrast, in *Bratten v. SSI Servs., Inc,* the Sixth Circuit found that an automotive mechanic, who had limited use of his back, arm, and shoulders, was not "otherwise qualified," because requiring other employees to perform as much as twenty percent of his essential lifting duties, as he requested, would be unreasonable. 185 F.3d 625 (6th Cir. 1999).

Here, Plaintiff requested the elimination of her airlift duties, finance duties, and part of her case load. However, Plaintiff has not provided any evidence that she would have successfully performed her remaining tasks. During her one year at the Marshal Service, Plaintiff went from several months of training to handling limited duties to handling all of the criminal clerk duties. There is no evidence of consistent successful performance at any stage of her employment. Moreover, like in *Bratten*, fulfilling Plaintiff's request to transfer a significant percentage of her duties to other employees would be unreasonable.

Third, Plaintiff neither proposed a reasonable accommodation nor does she, as previously stated, show that she would be qualified with an accommodation in place. "[I]n requesting an accommodation, we require plaintiffs not only to request to be accommodated, but to also provide their employers with a sufficient basis to understand that the request is being made because of their disability." *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016). Here, Norman's alleged request for accommodation never mentioned her disability, she only stated that she

was "overwhelmed" and needed help. Furthermore, when asked to fill out and submit forms to HR regarding her disability and any accommodation requests, Norman failed to do so. Her actions, and inactions, fall short of a reasonable request for accommodation for her disabilities. In addition, even if Plaintiff's email could be construed as an accommodation request, her request to reassign several of her essential job duties to different departments and employees is "per se unreasonable." *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017). Defendant is therefore entitled to summary judgment on Plaintiff's failure to accommodate claim.

## I.    Medical Disclosure, Retaliation, and Racial Discrimination Claims

Although Norman's Complaint alleges a medical disclosure violation, retaliation, and racial discrimination, her Response to Defendant's Motion for Summary Judgment failed to present evidence opposing summary judgment on these claims. The Court therefore considers these claims to be abandoned. *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[t]his Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

## CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [16] is **GRANTED**.

**SO ORDERED**.

                                                s/Arthur J. Tarnow
                                                ARTHUR J. TARNOW
                                                SENIOR U.S. DISTRICT JUDGE

Dated: July 27, 2020